1          UNITED STATES DISTRICT COURT

2           DISTRICT OF MINNESOTA

3

4     ------------------------------------------------------------

5                              )
      United States of America,  )  Case No. 14-CR-358(DSD/JJK)
6                              )
              Plaintiff,         )
7                              )
         vs.                    )  Minneapolis, Minnesota
8                              )  November 13, 2014
      Roxanne Merrell,          )  10:15 a.m.
9                              )
              Defendant.        )
10    ------------------------------------------------------------

11

          BEFORE **THE HONORABLE JANIE S. MAYERON**
12        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

13                **CONTINUED DETENTION HEARING**

14

      APPEARANCES:
15

      For the Plaintiff:       United States Attorney's Office
16                             KATHARINE T. BUZICKY, ESQ.
                               300 South 4th Street
17                             Suite 600
                               Minneapolis, Minnesota 55415
18

      For the Defendant:       Ellis Law Office
19                             DEBORAH K. ELLIS, ESQ.
                               101 East Fifth Street
20                             Suite 2626
                               St. Paul, Minnesota 55101
21

22    **DIGITAL RECORDING TRANSCRIBED BY:**

23

      Official Court Reporter:  JEANNE M. ANDERSON, RMR-RPR
24                              Suite 146 U.S. Courthouse
                                316 North Robert Street
25                              St. Paul, Minnesota 55101

1                    **P R O C E E D I N G S**

2                       **IN OPEN COURT**

3              THE COURT:  Good morning, everyone.  We are here

4      today in the continuation of the Detention Hearing in the

5      matter of the United States of America versus Roxanne

6      Merrell, Court File No. 14-358.

7              If counsel could identify themselves, starting

8      first with counsel for the United States?

9              MS. BUZICKY:  Good morning, Your Honor, Katharine

10     Buzicky on behalf of the United States.

11             THE COURT:  Good morning.  And on behalf of Ms.

12     Merrell?

13             MS. ELLIS:  Deborah Ellis, Your Honor, appearing

14     on behalf of Ms. Merrell, who is present.

15             THE COURT:  All right.  As I indicated, we are

16     here today on the continuation of the detention hearing.  As

17     the parties recall, I continued this hearing so that I could

18     gather more information regarding the State Court

19     proceedings which has been provided to me via Ms. Ellis to

20     Ms. Perez from Pretrial Services, and also to give Counsel

21     for the parties the opportunity to brief the issue as to

22     whether there are any legal constraints on me in terms of

23     allowing Ms. Merrell to return to the home and be in the

24     presence of her minor daughter.  And Counsel have responded

25     to that and provided me with those briefs, and I have those,

1    as well.  So, I am prepared to proceed at this time.

2            Let me just ask, I know that Ms. Ellis has a

3    witness who is here to testify on Ms. Merrell's behalf.

4    Before I do that, let me ask whether the Government has

5    anything further it wishes to say right now before we hear

6    that testimony or any further evidence it wishes to put on?

7            MS. BUZICKY:  Very briefly, Your Honor, I just

8    wanted to alert the Court to one --

9            THE COURT:  Why don't you come over to the podium,

10   please?

11           MS. BUZICKY:  Your Honor, prior to the hearing

12   beginning I talked with Ms. Ellis regarding the use of the

13   names of the children that are involved in the case.  And as

14   the Court is aware there are two minor children that Ms.

15   Merrell has care and control over.  And we agreed amongst us

16   that we would refer to Minor A as the female child and Minor

17   C for the male child.

18           THE COURT:  Okay.

19           MS. BUZICKY:  I just wanted to let the Court know.

20   And I think that will obviate any need for redactions or

21   other kinds of motions regarding sealing and things like

22   that.

23           THE COURT:  So Minor A for the female child and

24   Minor C for the male child?

25           MS. BUZICKY:  Yes, Your Honor.

1        THE COURT:  All right, thank you.  And Ms. Ellis,

2    would you like to proceed?

3        MS. ELLIS:  At this time we would like to call

4    Geri Robbins to the stand.

5        THE COURT:  All right.  Ms. Robbins, you are going

6    to come on over here to the left of me.

7        THE WITNESS:  Here?

8        THE COURT:  So -- yes, come through there.  There

9    you go.  And then make your way around here to this box

10   thank you.  If you would raise your right hand before you

11   get seated?

12        (Witness sworn.)

13        Thank you.  Please be seated and state your full

14   name, spelling your last name please.

15        THE WITNESS:  My first name is Geri, my middle

16   name is Jean, my last name is Robbins, R-o-b-b-i-n-s.  The

17   first name Geri is G-e-r-i.

18        THE COURT:  Thank you.  All right, Ms. Ellis, you

19   may proceed.

20                          **GERI ROBBINS**

21                      **DIRECT EXAMINATION**

22   **BY MS. ELLIS:**

23   Q.  Thank you, Your Honor.

24        Ms. Robbins, by whom are you employed?

25   A.  I am employed by the State of Minnesota.

1    Q.   In what capacity?

2    A.   I am a guardian ad litem.

3    Q.   And how long have you served as a guardian ad litem for

4    the State of Minnesota?

5    A.   Since April of 2012.

6    Q.   What is your educational background?

7    A.   My Bachelor's Degree is in Social Work and my Master's

8    Degree is in Social Work.

9    Q.   Before serving the State of Minnesota as a guardian ad

10   litem, where did you work?

11   A.   Actually, I was home with my children just doing some

12   mom jobs at a school, but I have a former history of child

13   protection with St. Louis County; and a medical social

14   worker at Hennepin County Medical Center.

15   Q.   Do you know Roxanne Merrell?

16   A.   Yes, I do.

17   Q.   How do you know Ms. Merrell?

18   A.   I was assigned as the guardian ad litem for her children

19   when the CHIPS Petition was brought to court.

20   Q.   When you talk about CHIPS, am I correct that is a child

21   in need of protection or services?

22   A.   Yes.

23   Q.   That is a State Court proceeding?

24   A.   That is in Washington County through Community Services.

25   Q.   Do you recall the month that the CHIPS proceeding was

1   initiated in Washington County?

2   A.  I was assigned in April of 2014, so in or around that

3   time, maybe late March.

4   Q.  And as a guardian ad litem, what are your duties and

5   responsibilities?

6   A.  Well, I work for the state and I am to advocate for the

7   best interest of the children and I am to make a

8   recommendation through the court about things that would be

9   helpful to them or the family.

10  Q.  Have you been involved in the CHIPS proceeding since it

11  was initiated?

12  A.  Yes, I have.

13  Q.  And who else has been involved in that proceeding?

14  A.  There has been a number of providers.  There is a child

15  protection social worker from Washington County Community

16  Services.  The children and Ms. Merrell all had

17  psychological evals by Campus Health.  The children have had

18  individual therapy.

19       There is an in-home therapist that the family has

20  been getting services from for several months.  And then, of

21  course, I do my investigation, also.

22  Q.  Are there also lawyers involved for Washington County?

23  A.  Yes, there is the County Attorney that represents

24  Community Services, and then Ms. Merrell has an attorney for

25  the CHIPS case.  And the oldest child, Child A has an

1    attorney.

2    Q.  Now, are you aware of what the basis was for the initial

3    petition seeking services for the children?

4    A.  Yes, I do.

5    Q.  What is that?

6    A.  My understanding was that Ms. Merrell took what would be

7    considered pornographic pictures of Child A from the neck

8    down.  No face shot, no way to identify.  And that she did

9    this to earn some money.  The money was never paid to her.

10   The man who she knew already, had a prior relationship with,

11   knew him in some capacity, was in trouble.

12          The police went to his computer and that is how

13   they found the picture.  The picture was actually taken

14   maybe three, almost four years ago.  And Child A, until the

15   CHIPS Petition, had no idea that anything -- that any

16   picture or any abuse had occurred.

17   Q.  And since you have been involved, have you learned of

18   any other allegations of pornographic photographs being

19   taken?

20   A.  No.

21   Q.  Have you learned of any other alleged sexual misconduct?

22   A.  No.

23   Q.  Have you in your capacity as guardian ad litem written

24   reports for the Court on a regular basis?

25   A.  Yes, I have.

1    Q.  And have you also appeared at court proceedings in the

2    CHIPS matter?

3    A.  Yes, every hearing I have been at.

4    Q.  Am I correct that those hearings happen about every 45

5    days or thereabouts?

6    A.  Yes.

7    Q.  And before those hearings would you provide a report

8    that goes to the Judge via lawyers, and the lawyers?

9    A.  Yes.

10   Q.  And in addition to the lawyers you said that there was a

11   community service representative.  Is that person a child

12   protection worker?

13   A.  Yes.

14   Q.  Has there been a child protection worker involved in

15   this case since you have been involved?

16   A.  Yes, even before.

17   Q.  Okay.  And was there a time that Ms. Merrell was removed

18   from the home where she was living with her children?

19   A.  Yes.

20   Q.  Do you recall approximately how long she was out of the

21   home?

22   A.  I think maybe three weeks.  I am guessing.  It wasn't a

23   real long time, several weeks probably.

24   Q.  How did it come about that she was permitted to move

25   back into the house?

1    A.   Community Services did an investigation.  And what they

2    determined was that the children would not be in danger if

3    she was residing with them.  And so she had been living with

4    her grandmother, the children's great grandmother.  So then

5    she came back to the home that is owned by her mother, the

6    children's grandmother.

7    Q.   So, community service, the child protection worker

8    determined that the children wouldn't be in danger if she

9    returned home?

10   A.   Yes.

11   Q.   Did you also weigh in on that as to whether the children

12   would be in danger if their mother lived with them?

13   A.   Yes, I did.

14   Q.   And what was your opinion?

15   A.   I felt the children were safe in her care.

16   Q.   Are you aware that a criminal complaint was filed

17   against Ms. Merrell in Washington County?

18   A.   Yes.

19   Q.   And was everyone in the CHIPS case made aware of that

20   parallel criminal case?

21   A.   I am almost certain, yes.  I am pretty sure, yes.

22   Q.   Now, has your opinion as to whether Ms. Merrell's

23   children would be in danger living with her changed at all

24   since the time that she was allowed to move back in?

25   A.   No.

1    Q.  Has the County Attorney ever objected to her living back

2    with her children?

3    A.  No.

4    Q.  Has the child protection worker from Washington County

5    Social Services ever made any objection to her living back

6    with the children?

7    A.  No.

8    Q.  When you write your report and make your recommendations

9    to the Court, is there an opportunity for any party to

10   object to your report and recommendation?

11   A.  Yes.

12   Q.  And has anyone ever objected to your recommendation as

13   far as the living arrangements with Ms. Merrell and her

14   children?

15   A.  No.

16   Q.  In addition to having contact with the children, have

17   you also had contact with Ms. Merrell?

18   A.  Yes.

19   Q.  Have you formed any opinion as to whether or not she is

20   likely to runaway or flee from these court proceedings?

21   A.  Yes.

22   Q.  What is your opinion?

23   A.  I feel she has no interest in leaving.  Her whole life

24   is here.  Her children are here.  She has no money to leave.

25   She has nowhere to go.  She is cooperating with Community

1    Services.  And she knows that would mean she wasn't

2    cooperating and she doesn't want to do that.  I think she

3    finds the services helpful.

4    Q.  And you talked about services and I think you and I had

5    talked beforehand about this MTS therapy that she is

6    participating in?

7    A.  Yes.

8    Q.  Could you inform us as to what MTS stands for?

9    A.  It is multisystemic family therapy.  And it is offered

10   through Community Services in Washington County.  And it is

11   only offered through Community Services when there is a

12   CHIPS Petition.  And it is to help alleviate having to

13   remove children from the home.  It is very intensive.

14   Q.  How did it come about that Ms. Merrell and her family

15   had been participating in the MTS therapy?

16   A.  I believe it was recommended through the parenting

17   assessment that it would be helpful for them to have family

18   therapy, and this was an intensive program offered through

19   Community Services.  And so the social worker took advantage

20   of that opportunity.  Cassandra Lee is the therapist of the

21   family.

22   Q.  Is that in-home therapy that Ms. Lee provides?

23   A.  Yes.

24   Q.  So she goes to the residence in Cottage Grove and meets

25   with Ms. Merrell and her children as needed?

1    A.   Yes.

2    Q.   Now, having worked with the children for -- what, 7, 8

3    months?

4    A.   Yes, since the beginning of the petition, since April.

5    Q.   Do you have an opinion as to whether the children are in

6    danger at all with Ms. Merrell living with them?

7    A.   Yes, I do.

8    Q.   What is that opinion?

9    A.   Well, being that I get to know them better and better as

10   time goes on, I feel more and more sure that the children

11   are not unsafe with her.  Actually, they lean on her.  There

12   is a very strong bond.  The parenting assessment referred to

13   that.  She provides for their needs.

14        I watch them talk to her.  They want things from

15   her.  They enjoy being with her.  It is a very good

16   situation for them.  It is what they know and who they love.

17   Q.   Do you have an opinion as to whether it would be in the

18   best interest of Child A to have her mother removed from the

19   home and have no contact with her?

20   A.   Yes, I do.

21   Q.   What is that?

22   A.   I think that would be very damaging for this child.

23   When I first went out, I went to meet her without her

24   knowing I was coming to school.  And she was afraid of me at

25   first.  She thought, oh-oh, it is someone coming to take me

1    away.  And I told her who I was and what I did.  And she

2    said, "Oh," she said, "the worst thing that ever happened to

3    me was I was put in a foster home.  I have never been in a

4    foster home."

5           So, she was afraid at first.  But now she knows me

6    and she is not.  As time goes on, I see Ms. Merrell being

7    interested in the services, really liking the in-home

8    therapy.  I talked with Cassandra Lee on October 7th, and

9    she said that Ms. Merrell was fully engaged, you know, they

10   go out about twice a week.  So, I think it is a very good

11   thing.

12   Q.  And Ms. Lee is a therapist through the multisystem

13   family therapy group, is that right?

14   A.  Yes, yes.

15   Q.  And do you have an opinion whether it would be in the

16   best interest of Child C if his mother was removed from the

17   home?

18   A.  Well, I went to see Child C at school, also, the first

19   time, and he was very fearful of me.  They are both

20   traumatized by the fact that they were placed in foster

21   care.  They were still upset when they got to go back to

22   grandmother's house, but their mother could not be there.

23   They were just totally relieved to have her come home.

24          There is a strong bond here, so I think it would

25   be very damaging for both of the children not to be with

1    their mother.

2    Q.  And you base that opinion on your training and

3    experience as guardian ad litem and in your capacity

4    representing those children?

5    A.  Yes, and I also talked with the parenting assessor.

6    Q.  And so the parenting assessment has been done on Ms.

7    Merrell, is that correct?

8    A.  Yes.

9    Q.  Was that done in the summer?

10   A.  Yes, it was.

11   Q.  And there have been court appearances since that time,

12   is that correct?

13   A.  Yes.

14   Q.  And am I correct that the next review hearing in the

15   CHIPS proceeding is scheduled for sometime in January?

16   A.  I believe that is right.

17   Q.  And in your opinion, has Ms. Merrell followed through

18   with what has been requested of her by Community Service

19   child protection workers?

20   A.  Yes.

21   Q.  And do you have an opinion as to what the result would

22   be if Ms. Merrell was ordered not to have any contact

23   whatsoever with Child A?

24   A.  I think it would be a huge, huge setback for her.  I am

25   sure there has been a setback just from her mother being in

1    jail right now.  There is a bond there.  And because of the

2    issues Child A has, I think she is dependent on her mother

3    for help.  And to have her not there is very disturbing to

4    her.  And I think it would hold her back.  I think it would

5    leave a scar.

6    Q.  Could you just elaborate a little bit on the issues that

7    you -- that Child A has?

8    A.  She has ADHD.  She also has anxiety.  She has PTSD.  I

9    know she has -- if I can say the word, trichotillomania.

10   But, it turns out to be, it is anxiety-based and she will

11   pull out her eyebrows and her eyelashes when she is

12   stressed.

13   Q.  Does she have an Individualized Education Plan?

14   A.  Yes, she does.

15   Q.  Does that require participation by parents, as well as

16   educators?

17   A.  Yes, parents are involved.

18   Q.  Have you been involved with the school with her IEP at

19   all?

20   A.  Not with her IEP, that was already set up when I came on

21   board.

22   Q.  When you talked about some of these issues that she has,

23   ADHD, anxiety, PTSD, in your opinion, are these all related

24   or at all related to Ms. Merrell's conduct with respect to

25   the photographing?

1    A.   No, Child A has had these for a number of years, many

2    years.  Since young childhood, I believe.

3              MS. ELLIS:  Thank you.  I have no further

4    questions, Your Honor.

5              THE COURT:  All right, Ms. Buzicky?

6              MS. BUZICKY:  Yes, Your Honor.

7                       **CROSS EXAMINATION**

8    **BY MS. BUZICKY:**

9    Q.   Good morning, Ms. Robbins, how are you today?

10   A.   I am fine, thank you.

11   Q.   I have a few questions relating to your testimony here

12   today and also to the reports that you created as a part of

13   your guardian ad litem duties.

14   A.   Uh-huh.

15   Q.   First things first.  When you provide these reports from

16   my reading of them, you actually go into the home.  Is that

17   correct?

18   A.   Yes.

19   Q.   And so you are aware that eight people are living in a

20   home of about 800 square feet?

21   A.   Yes.

22   Q.   And you are aware that both Minor A and Minor C do not

23   have bedrooms?

24   A.   Yes.

25   Q.   They do not really even have beds, is that correct?

1    A.   They have couches.

2    Q.   They have couches.  And that the Defendant sleeps on a

3    chair or a modified chair, correct?

4    A.   Yes.

5    Q.   And so the children are in fact not given any real

6    measure of privacy because the living room where they are

7    living is a communal area that is accessible to anyone in

8    the home?

9    A.   Yes.

10   Q.   And you are aware the home is in disarray and the smell

11   of some sort of animal litter or cat litter in the home?

12   A.   I have not smelled any odors.

13   Q.   And with respect to the state of the cleanliness of the

14   home, you have seen that it is not a clean home; is that

15   correct?

16   A.   I have seen that there is clutter.

17   Q.   Now, regarding your testimony relating to the bond

18   between the children, Minor A and Minor C and the Defendant,

19   have you had experience in cases other than this involving

20   sexual abuse?

21   A.   Yes, I have.

22   Q.   And so you are familiar, are you not, that many abusers

23   use love, affection, regard, special interest, as a means to

24   get to a child; don't they?

25   A.   Yes.

1    Q.  And many children who are abused by adults are actually

2    loving or even sometimes in love with their abuser?

3    A.  Yes, they love them.

4    Q.  And they rely on their abuser because that abuser has

5    given them special attention and special favors, is that

6    correct?

7    A.  I don't believe so in this case; but I think, yes, as a

8    general rule that has happened.

9    Q.  So that perception of a child abuser as a scary person

10   with a scary, broken-down van is actually sort of a false

11   stereotype; isn't that correct?

12   A.  Usually people know their abuser.

13   Q.  Usually they know their abuser and have daily or weekly

14   access to their abuser because that is a family or

15   friendship relationship; isn't it?

16   A.  Yes.

17   Q.  Now you testified regarding your understanding of the

18   sexual abuse in this case, and you said that there was a

19   picture of a child, Minor A, and it was from the neck down.

20   In other words, no face; is that correct?

21   A.  That is what I was told.

22   Q.  And in fact, you are not aware of the entire scope of

23   the child pornography there is in this case, then, are you?

24   A.  Not entirely, no.

25   Q.  So you are not aware that there were actually about

1    eight images, are you?

2    A.  My understanding, I thought, was two.

3    Q.  Now, to clarify and for the benefit of the Court, two

4    images are charged in this case.

5    A.  Oh.

6    Q.  But there are actually about eight images that the

7    Defendant is alleged to have created.

8            Now, have you seen any of those images?

9    A.  No.

10   Q.  And so you are not aware that one of those -- or two of

11   those images that are charged in this case actually depict

12   hands-on abuse by the Defendant, are you?

13   A.  I was told that there was.

14   Q.  And so do you know that in those pictures the

15   Defendant's hands are alleged to be spreading the vaginal

16   lips of this little child apart and a close-up picture has

17   been taken of the child's genitalia?

18   A.  I was told that by Community Services.

19   Q.  And those pictures were sent to a sex offender named

20   Travis Guenthner, were you aware of that?

21   A.  I didn't know his name, but I knew it was a person that

22   Ms. Merrell knew.

23   Q.  And that he had special ordered pictures, naked and

24   below the waist, of this child.  Did you know that?

25   A.  I didn't know of his specific requirements I knew

1     pictures were given and.

2     Q.  And you knew the Defendant did this in the expectation

3     of money, didn't you?

4     A.  Yes.

5     Q.  And did you know how much money that was to be?

6     A.  I believe she was promised 4 or $5,000 that never

7     materialized.

8     Q.  Are you aware that the Defendant said that there was

9     $5,000 promised, but Travis Guenthner claims that there were

10    $100,000 promised?

11    A.  I never heard that.

12    Q.  Now, you mentioned that there had been follow through by

13    the Defendant relating to the plans in place in Washington

14    County, is that correct?

15    A.  Yes.

16    Q.  But, you are also aware that the Defendant was

17    recommended to put Minor C in summer school and didn't do

18    that, in fact; aren't you?

19    A.  Yes.

20    Q.  And that she claimed that she had some sort of dispute

21    with his teacher and that is why Minor C didn't go to summer

22    school, is that correct?

23    A.  I believe that was it, that she was hoping it would be a

24    different teacher.  I don't know who ultimately was doing

25    summer school, but she chose not to send him.

1    Q.  Now you are talking about the number of people who are

2    involved in the protection and supervision of this family.

3    And you mention in your report a psychological evaluation.

4    Do you recall seeing documents related to a psychological

5    evaluation of Minor A?

6    A.  Yes.

7              THE COURT:  Do you want to tell us which report

8    you are referring to, what the date of it is?

9              MS. BUZICKY:  Oh, certainly.  This is a GAL report

10   that is dated July 8th, 2014, Your Honor.

11             THE COURT:  All right.

12             MS. BUZICKY:  And it is on page 3 towards the

13   bottom third of the report, the witness mentions, there is a

14   paragraph regarding a psychological evaluation of Minor A.

15             THE COURT:  All right.

16             MS. BUZICKY:  Now, that report --

17             THE COURT:  Let me make sure.  Do you have a copy

18   of that report in front of you?

19             THE WITNESS:  Yes I do.

20             THE COURT:  Go ahead.

21   BY MS. BUZICKY:

22   Q.  Now that report is by a psychologist, is that correct?

23   A.  Doctoral intern.

24   Q.  Doctoral intern.  And that professional recommended that

25   Minor A was not to have any contact with the Defendant other

1    than supervised contact, is that correct?

2    A.  Yes.

3    Q.  And that she be placed in a therapeutic foster home, is

4    that correct?

5    A.  Yes.

6    Q.  And that that psychologist stated that Minor A is at

7    continued risk for emotional neglect by her mother, a lack

8    of attachment between Ms. Merrell and Minor A, and the

9    Defendant's inability to empathize with Minor A.  Were you

10   aware of those findings?

11   A.  Yes, I read that.

12   Q.  And so it is not quite correct that everybody involved

13   in this case is interested in seeing reunification, is that

14   correct?

15   A.  The doctoral intern was not.

16   Q.  One final question for you.  Is it your understanding

17   that the goals of the guardian ad litem program are, when

18   possible, to reunify families?

19   A.  No, our goals are to always make the best

20   recommendations for the children, whatever that means.

21   Q.  And that is quite different from criminal prosecution,

22   isn't it?

23   A.  Yes.

24           MS. BUZICKY:  No further questions, Your Honor.

25           THE COURT:  All right.  Ms. Ellis, any follow-up?

1          **REDIRECT EXAMINATION**

2      **BY MS. ELLIS:**

3      Q.  You mentioned a doctoral intern.  Who is the doctoral

4      intern?

5      A.  I believe her name was Emily Kanter, K-a-n-t-e-r, I

6      think.

7      Q.  Is she the one who prepared the parenting report?

8      A.  No, Mary Maguire from Adler Center did the parenting

9      assessment.  Emily Kanter was from Kansas Health and she did

10     Child A's psychological evaluation.

11     Q.  And she did that in -- before your July report, is that

12     correct?

13     A.  I think so, yes.

14     Q.  And since that time you have been to court a couple of

15     times, is that right?

16     A.  Right.

17     Q.  You have been in July and you have been in August and

18     maybe even --

19     A.  September -- I mean, October.

20     Q.  October.  Okay, so three other times.  Did anyone else

21     support the recommendation of the intern?

22     A.  No.  I did not as guardian ad litem.  Child Protection

23     and the County Attorney did not.  I called the Parenting

24     Assessor Mary Maguire.  She did not support the

25     recommendation.  And so the Judge went with our

1    recommendations over the psychologist's recommendation.

2    Q.  So, the psychologist that recommended that she be --

3    that there be some separation between Child A and the mother

4    was not supported by any of the other lawyers, guardian ad

5    litem or social workers; is that right?

6    A.  Not that I know of, no.

7    Q.  And that report was made available to the Judge in

8    Washington County, is that right?

9    A.  I don't know what the Judge saw, the psychological -- I

10   mean, I know it was discussed that their recommendation was

11   different than everybody else's.

12   Q.  And the Judge did not change or order anything different

13   than what had been in place prior to that report, correct?

14   A.  The Judge ordered what Community Services was

15   recommending.

16   Q.  Which is that -- the therapy, the MTS therapy?

17   A.  Yes.  Recommended, yes.

18   Q.  And have you -- you said that you have had experience

19   with other cases involving sexual abuse, and that the abuser

20   might try and cozy up to a possible victim; is that right?

21   A.  Yes.

22   Q.  Have you seen any evidence in this case that Ms. Merrell

23   at all is taking any action to groove or be a predator to

24   either of her children?

25   A.  No.

1    Q.  The children have contact with their father, is that

2    correct?

3    A.  Yes.

4    Q.  He lives out of state?

5    A.  Yes.

6    Q.  But he comes to visit a few times a year?

7    A.  Several times, yes.

8    Q.  And he was here recently, is that right?

9    A.  I think he was here late summer.

10   Q.  They also have phone contact with him, correct?

11   A.  Yes.

12   Q.  They also have access to a number of school

13   professionals, is that right?

14   A.  Yes.

15   Q.  And child protection is involved?

16   A.  Yes.

17   Q.  Now, with respect to Child C, and the summer school

18   program, was that essentially worked out with the school and

19   Ms. Merrell as to how to improve Child C's reading level?

20   A.  Yeah, they thought it would be helpful, but I don't

21   remember the Judge ordering it, specifically.

22          And so, yeah, the school felt that Child C was

23   having some difficulty with his reading.

24   Q.  Because he had changed schools, is that right, a few

25   years earlier?

1    A.  Yes, right, several years earlier.

2    Q.  And his reading level had dropped somewhat?

3    A.  Right.  The teacher told me it was comprehension she saw

4    him having a problem with.

5    Q.  And this was a subject that was addressed in a hearing

6    in the CHIPS proceeding before Judge Schurrer, is that

7    correct?

8    A.  Yes.

9    Q.  And am I correct that it is Gary Schurrer who has

10   presided over the CHIPS proceedings for the last several

11   months, maybe from the very beginning?

12   A.  Yes.

13   Q.  And if the children felt in any way that they were being

14   threatened, endangered, or abused, do they have adults in

15   their life that they could contact?

16   A.  Numerous.

17   Q.  Thank you.  No further questions.

18           THE COURT:  Thank you.  Ms. Buzicky, anything

19   further?

20           MS. BUZICKY:  No, Your Honor.

21           THE COURT:  All right, you may step down.  Thank

22   you very much.

23           THE WITNESS:  Am I allowed to leave, Your Honor?

24           THE COURT:  Yes, you are.

25           THE WITNESS:  Thank you very much.

1          (Witness excused.)

2          THE COURT:  Ms. Ellis, any further evidence that

3    you wish to put on on behalf of your client?

4          MS. ELLIS:  No, Your Honor.

5          THE COURT:  All right.  Then again, I will hear

6    arguments from Counsel in light of the evidence that was

7    provided to me over the course of several days and the

8    testimony of the witness, and also the legal issues that

9    were raised in the briefs that were provided by counsel.  We

10   will go ahead and start with the Government.

11         MS. BUZICKY:  Your Honor, the United States is

12   seeking detention in this case as outlined in our motion and

13   in our supplemental briefing, relating to the Adam Walsh Act

14   conditions.  I would like to first briefly address the issue

15   of the Adam Walsh Act conditions.

16         Our briefing, I believe, has sufficiently

17   established that the Adam Walsh Act conditions are in fact

18   mandatory and the Court does not have discretion to either

19   limit or modify the condition regarding no contact between

20   an alleged victim and a defendant.

21         THE COURT:  Let me just ask a question.  Ms. Ellis

22   in her responsive brief raises the issue that if this Court

23   were to conclude under 3142 that Ms. Merrell could be

24   released on her own personal recognizance or an unsecured

25   bond with no other conditions, that therefore Subsection (c)

1    of 3142 which lays out the -- which addresses, among other

2    conditions, the Adam Walsh conditions, doesn't kick in.  And

3    so, it has no application under those circumstances.

4            As I understand what she was saying, it only would

5    apply and be mandatory if I concluded that the Defendant

6    could not be released under her own personal recognizance or

7    an unsecured bond.

8            MS. BUZICKY:  Your Honor, I think the language of

9    the statute is clear that in any case that involves a minor

10   victim, and then it lists a number of sections including the

11   Section 2251 production of child pornography, any release

12   order shall contain at a minimum the condition of no

13   contact.

14           And so if you look at the scope of release orders,

15   those are release orders spanning from the personal

16   recognizance all the way up to the most restrictive release

17   order, say a halfway house with very incarcerative

18   conditions.  Any release order means any release order.  And

19   I think our District favors a plain reading of the statute,

20   because it is clear.

21           With respect to the argument for detention, the

22   United States continues to seek detention in this case.

23   This case is among the small subset of cases that are

24   brought in this District where a physical child known to all

25   of the parties and identified to the Court has been

1    physically abused and images or videos have been created, in

2    this case a series of images.  And in this case the

3    egregious additional fact that these were created for money,

4    that this is an example of somebody who has a psychological

5    disorder or deficit of pedophilia, or some other paraphilia

6    where they are literally in their mind driven to sexually

7    abuse a child.

8          This is a person who is supplying those people for

9    money.  So, it is a cold and calculating act for money that

10   cannot even be explained by a psychological disease or

11   deficiency such as pedophilia.

12         Your Honor, in this case detention is the only

13   appropriate situation for the Defendant because she poses a

14   risk to other people in the community.  And I would point

15   the Court to a number of things that are in the documents

16   that the probation officer had supplied, records of

17   dangerous conditions for Minor A going back to infancy,

18   including a Cottage Grove report from 2001, where a child,

19   infant child Minor A is described as being surrounded by

20   alcohol bottles in a smoke-filled room as parents are

21   arguing and becoming physically violent with each other

22   continuing all the way up to the present day where Minor A

23   and Minor C are living with six other people in an

24   800-square-foot house.

25         Your Honor, the egregiousness of creating child

1    pornography for pay is just one factor in this case.  The

2    Defendant is a danger to others in the community and the

3    Defendant should be detained.  Thank you.

4            THE COURT:  All right, Ms. Ellis?

5            MS. ELLIS:  Your Honor, we ask that Ms. Merrell be

6    released on her personal recognizance or an unsecured bond.

7    That is required under Section 3142 of Title 18, unless the

8    Court determines that it will not reasonably assure her

9    appearance that she is going to flee or that she endangers

10   the safety of others or the community.  And I think that the

11   testimony today and the fact that these allegations have

12   been known to everyone since at least March -- there have

13   been two proceedings in State Court -- the allegations have

14   not changed.  I have included a copy of the criminal

15   complaint from Washington County with my responsive

16   memorandum.

17           I mean, regardless of how it gets characterized as

18   to how horrible it was four and a half years ago, there has

19   been absolutely no evidence.  And I believe that the

20   Homeland Security agent who has been involved since at least

21   March who testified there is no evidence that there has been

22   any other misconduct, abuse, physical, sexual, toward Child

23   A, or anyone else.

24           And so, I think that there is no basis by which to

25   find that Ms. Merrell is a flight risk.  She has made all of

1    her court appearances.  She wasn't even required to post

2    bail or subjected to any conditions in Washington County.

3    She responded to a notice that came in the mail.

4          As far as endangerment, this is four and a half

5    years ago.  This guardian ad litem who is charged with

6    looking out for the best interests of the child has clearly

7    stated that Child A is going to be more traumatized and

8    scarred.  Child A did not even realize that this event had

9    occurred back in 2010.  And now her mother would be taken

10   away from her and removed from the home.  It is draconian.

11         I acknowledge that the Adam Walsh Act imposes some

12   very severe penalties for acts that are proscribed, but it

13   does not require that she be detained or that any of those

14   conditions that are outlined in (c), those subparagraphs of

15   (iv), (v), (vi) and (vii) of the smaller Roman numerals be

16   applied unless the Court can find that she is a flight risk

17   or will endanger someone else in the community.

18         And, as far as whether the house is in disarray,

19   this Court can't really change the living conditions for the

20   children.  There is nothing to suggest that they are in

21   harm's way or that Ms. Merrell has done anything to endanger

22   her children.  And I would urge the Court not to endanger

23   Child A or C by removing their mother from them.  And in an

24   alternative to detention, which they have asked for, I would

25   ask the Court to at least consider a placement in a halfway

1    house and not restrict the contact with the children because

2    it is going to disrupt some very intense therapy.

3           This MTS therapy, which I had talked to the child

4    protection worker about yesterday said it is the most

5    intense therapy that they have.  And they were fortunate to

6    be able to arrange it and to restrict this family from

7    continuing in therapy, regardless of what the charges are

8    and what the potential penalties are.

9           We are not locking people up for life based on

10   allegations or even on convictions.  And this family has

11   a -- has a bond that the federal prosecutors I think are off

12   base in trying to disrupt and to punish some innocent

13   children.  Thank you.

14           THE COURT:  All right.  Having considered the

15   evidence that was presented to me last week and the evidence

16   that was presented here today, the various documents that

17   were provided to me from the State Court proceeding, taking

18   into account the arguments of counsel, the briefing by

19   counsel, I am going to deny the Government's Motion For

20   Detention.

21           However, I am going to be issuing an order setting

22   conditions of release that I will go over with Ms. Merrell

23   and then request that Ms. Ellis review with Ms. Merrell as

24   well.  That is the general overview.

25           That said, I am concluding that under no set of

1    circumstances does Ms. Merrell qualify for release under 18

2    U.S.C. Section 3142(a)(1) or (b), which would allow for her

3    release on a personal recognizance or unsecured appearance

4    bond.   There is no basis.   And I would not release her under

5    those circumstances, as I do find that conditions must be

6    put in place to reasonably ensure the safety of the

7    community and also the safety of other persons, and

8    including Ms. Merrell, herself.   So, I do conclude that

9    3142(b) will not apply here and that, rather, I will be

10   subjecting her to a combination of conditions under 3142(c),

11   which will include as mandated by the Adam Walsh Act that

12   she have no contact with the Minor Victim A, which we have

13   called Minor A during the pendency of this Federal Court

14   proceeding.

15          I reach the conclusion I do, first of all, because

16   the presumption is, Ms. Merrell, that in fact you would be

17   detained.   That is the starting place.   And then the

18   question is whether I believe that evidence has been

19   presented that would allow me to release you under certain

20   conditions, a combination of conditions that would

21   reasonably ensure the safety of other persons, including

22   yourself, and also your continued appearance here in court.

23          I have concluded the presumption has been

24   overcome, but not to the extent of releasing you on a

25   personal recognizance, under your own personal recognizance,

1     or simply an unsecured bond.  The only way that I can ensure

2     the safety of yourself and other persons is to require a

3     host of conditions that you must comply with, many of which

4     are part of the State Court proceedings where you are

5     required to, by Court Order, to follow certain

6     recommendations and requirements that they have set forth.

7          So, once Section 3142(c) is triggered, that act is

8     mandatory.  It does require that the Adam Walsh Subsections

9     (iv) through (viii) be incorporated into any release, and

10    that includes avoiding all contact with the alleged victim

11    which would be Minor A, with any potential witness who may

12    testify concerning the offense.

13         So, with that, I have concluded that I will be

14    placing Ms. Merrell in a halfway house.  She will be

15    prohibited from having any contact with Minor A.  She will

16    be permitted to have contact with Minor C and other

17    children, so long as she is in the presence of a responsible

18    adult who is 18 years or older.  So -- and then there are

19    other conditions I am going to be putting in place.

20         So, at this time I am going to review the Order

21    setting conditions of release with Ms. Merrell.  And then

22    when I am done, I am going to ask if you will comply with

23    them.  If you agree that you will comply with them, I will

24    then ask Ms. Ellis to actually review this Order with you so

25    you can see it in black and white and you can see the

1     sanctions and penalty sections that would be brought to bear

2     against you if you were to violate any term or condition of

3     the Order.

4          Do you understand, Ms. Merrell?

5          THE DEFENDANT:  Yes.

6          MS. BUZICKY:  Your Honor?  May I respectfully seek

7     a 24-hour stay of this Order so that we can decide whether

8     or not we wish to seek review at the District Court level?

9          THE COURT:  No.  She will be released to a halfway

10    house.  You certainly are free to -- and I understand there

11    is a placement available today.  I am not going to stay the

12    effect of the Order.  The Government certainly has the

13    option of appealing the Order, as does the Defendant.  And

14    then you can proceed with that.

15         If Judge Doty disagrees with my finding, whether

16    he would deem that she should be detained or whether he

17    deems she shouldn't be placed in a halfway house.  Should

18    the Defendant appeal it, that will be the time for action at

19    that time.  I will not stay the impact of this Order.

20         MS. BUZICKY:  Yes, Your Honor.

21         THE COURT:  All right.  It is ordered that the

22    Defendant is released, subject to the following conditions.

23    Number one, you must not violate any federal, state, or

24    local law while on release.

25         Number two, you must cooperate in the collection

1    of a DNA sample if it is authorized by 42 USC Section

2    14135a.

3              Number three, you must advise the Court or

4    Pretrial Services Office or your supervising officer in

5    writing before you make any change of residence or phone

6    number.

7              Number four, you must appear in court, as

8    required, and if convicted you must surrender as directed to

9    serve a sentence as the Court may impose.

10             Number five, you must sign an appearance bond, if

11   ordered, and I will be requiring that you sign an unsecured

12   bond in the amount of $25,000 which requires that you appear

13   in court proceedings.  If convicted, that you must surrender

14   to serve a sentence that the Court may impose, and to comply

15   with all conditions set forth in the Order setting

16   conditions of release.

17             The next condition is that you must submit to the

18   supervision by and report for supervision to the Probation

19   and Pretrial Services Office.  The phone number is provided

20   here in this Order, and you must make contact at that number

21   by tomorrow.

22             You must continue or actively seek employment.

23   You must abide by the following restriction on your travel.

24   Travel is restricted to the state of Minnesota unless

25   pre-approved by the United States Probation Officer.

1          You must avoid all contact directly or indirectly

2     with any person who is or may be a witness in the

3     investigation or prosecution including, and I am referring

4     to your daughter, minor daughter, as Minor A in this Order.

5          The next condition is you must comply with all

6     recommendations for your psychological -- that flow from

7     your psychological and psychiatric evaluations.

8          The next condition is you must maintain a

9     residence at a halfway house as the supervising officer

10    considers necessary.  And I am requiring that you be in a

11    halfway house.  The next condition is you must not possess a

12    firearm, destructive device or other weapon.

13         The next condition is you must not use alcohol

14    excessively.

15         The next condition is you will be subject to the

16    following restrictions on your ability to leave the halfway

17    house.  You are restricted to the residence, the halfway

18    house, at all times except for employment, education,

19    religious services, medical substance abuse or mental health

20    treatment, attorney visits, court appearances, Court-ordered

21    obligations, or other activities approved in advance by the

22    Pretrial Services Office or your Pretrial Services Officer.

23         The next condition, you must submit to location

24    monitoring as directed by the Pretrial Services Officer,

25    your supervising officer, and comply with all of the program

1      requirements and instructions provided.  You will be subject

2      to GPS electronic monitoring.

3              The next condition is you must report as soon as

4      possible to the Pretrial Services Office or your supervising

5      officer every contact you have with law enforcement

6      personnel, including arrest, questioning or traffic stops.

7              The next condition is you must follow all

8      Court-ordered recommendations and requirements of the

9      Washington County Court.  The next condition is you must

10     follow all recommendations of the Washington County Guardian

11     Ad Litem Program.

12             The next condition is you must agree to release

13     all reports of the Washington County Court Services, Child

14     Protection and Guardian Ad Litem Program to the United

15     States Probation Office.

16             The next condition is that in the event the

17     guardian ad litem recommends that Washington County

18     jurisdiction ends, you must notify your United States

19     Probation Officer of this recommendation.

20             The next condition is you shall not possess a

21     computer or use a computer or have access to any online

22     service without prior approval of the United States

23     Probation and Pretrial Services Office.  Your cooperation

24     shall include, but is not limited to installing,

25     installation of a computer or internet monitoring program,

1    or identifying computer systems, internet capable devices

2    and similar memory and electronic devices to which you have

3    access.

4            Monitoring may include random examinations of

5    computer systems along with internet, electronic and media

6    storage devices under your control.  The computer systems or

7    devices may be removed for a more thorough examination, if

8    necessary.  And you shall contribute to the cost of such

9    monitoring services based on your ability to pay as deemed

10   appropriate by the U.S. Probation and Pretrial Services

11   Office.

12           The next condition is you shall refrain from

13   accessing that matter which relates to the activity in which

14   you were engaged in committing the alleged instant offense,

15   namely child pornography.

16           The next condition is you shall provide to the

17   probation officer access to any requested financial

18   information, including credit reports, credit card bills,

19   bank statements and telephone bills.  The next condition is

20   you shall not associate with persons under the age of 18,

21   except in the presence of a responsible adult who is aware

22   of the nature of your background and current offense and has

23   been approved by the probation officer.

24           The next condition is you shall submit your

25   person, residence, office, vehicle or area under your

1    control to a search conducted by the United States Probation

2    Office or a supervised designee at a reasonable time in a

3    reasonable manner based upon reasonable suspicion of

4    contraband or a supervision violation.  You shall warn any

5    residents or third parties that the premises and areas under

6    your control may be subject to searches pursuant to this

7    condition.

8            The next condition is you shall not possess, view

9    or access pornography or other explicit images.  You shall

10   not own, possess or use photographic or video equipment, a

11   camera, phone or other electronic device which can be used

12   for covert photography without prior permission of your

13   probation officer.

14           Finally, you shall not rent a post office box or

15   storage facility without the prior approval of your

16   probation officer.  And before I ask if you are willing to

17   comply with these conditions, Ms. Merrell, I do want you to

18   know that at the halfway house you are going to be subject

19   to a number of terms and conditions there.  They are

20   regulations that are not itemized here.  I want you to know

21   that if you violate any of their regulations, terms and

22   conditions, those violations can trigger a violation of the

23   Order setting conditions of release.  It can lead to them

24   terminating their relationship with you, meaning requiring

25   that you leave the halfway house.  I will not have another

1     halfway house to place you in.  So that, in and of itself,

2     could create a violation of this Order.  So, I want you to

3     be aware of it.  They have very strict rules and regulations

4     for you to follow.

5            With that said, do you agree to comply with the

6     Order setting your conditions of release?

7            THE DEFENDANT:  Yes.

8            THE COURT:  Pardon?

9            THE DEFENDANT:  Yes.

10           THE COURT:  All right.  Then, Ms. Ellis, if you

11    could come up to the podium?

12           MS. BUZICKY:  Your Honor, I apologize for

13    interrupting.

14           THE COURT:  If you could come over to the -- so we

15    can make sure we can hear you?

16           MS. BUZICKY:  Your Honor, I note that you ordered

17    compliance with the guardian ad litem recommendations, and

18    it appears at least from my reading of some of those

19    recommendations they would conflict with the Adam Walsh

20    conditions of no contact between Minor A and the Defendant.

21           So, I just ask that there will be a sentence

22    inserted in your Order that those conditions be complied

23    with so far as they do not conflict with this Court's Order.

24           THE COURT:  I think that is a good request.  Any

25    response to that, Ms. Ellis?

1        All right, then before you come up, Ms. Ellis, to

2    take a copy of this, let me add that language.

3        All right.  Ms. Ellis, do you want to come up to

4    the podium?  If you would review the Order and bond with

5    your client.  Make sure she is aware of the sanctions and

6    penalty section of the Order.  And when she is done

7    reviewing it with you, if she would sign both the Order and

8    the bond, and I will sign it, as well.  We will go off the

9    record.

10        (Adjournment.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**

**Defendant's Witness:**

GERI ROBBINS

    Direct Examination by Ms. Ellis      Page  4

    Cross Examination by Ms. Buzicky    Page  16

    Redirect Examination by Ms. Ellis   Page  23

1

2

3                              CERTIFICATE

4

5

6

7                    The foregoing transcript is a

8      transcription of the digital audio recording that was

9      produced in the above matter by Court staff and later

10     submitted to myself, Jeanne M. Anderson, for transcription.

11     An official court reporter was not present to produce a

12     stenographic and verbatim record of the aforementioned

13     proceeding at the time and place specified herein.

14

15

16

17          Certified by:   s/ Jeanne M. Anderson

18                          Jeanne M. Anderson, RMR-RPR
                            Official Court Reporter
19

20

21

22

23

24

25