## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                                    Crim. No. 14-358 (DSD/JJK)

        Plaintiff,

v.                                                           **REPORT AND**
                                                             **RECOMMENDATION**

Roxanne Merrell,

        Defendant.

Katharine T. Buzicky, Esq., Assistant United States Attorney, counsel for Plaintiff.

Deborah K. Ellis, Esq., Ellis Law Office, counsel for Defendant.

JEFFREY J. KEYES, United States Magistrate Judge

## INTRODCUTION

The government has charged Defendant Roxanne Merrell with two counts of production of child pornography in violation of 18 U.S.C. §§ 2251(a) and 2251(e).  During the government's investigation of Merrell for production of child pornography, Merrell made certain incriminating statements to law enforcement officers, and an agent with the Department of Homeland Security took photographs of Merrell's hands.  Merrell now seeks an order suppressing the statements she made and preventing the government from using the photographs of her hands at trial on the grounds that the government obtained such evidence in violation of her constitutional rights.  (Doc. Nos. 22-23.)  Merrell also moves the Court to dismiss the indictment charging her with production of

child pornography on the grounds that her constitutional rights have been

violated by unreasonable delay in her prosecution.  (Doc. No. 27.)  For the

reasons stated below, this Court recommends that: (1) Merrell's motion to

suppress statements be granted in part and denied in part; (2) her motion to

suppress photographs taken pursuant to a search warrant be denied; (3) her

motion to suppress evidence obtained by an administrative subpoena be denied;

and (4) her motion to dismiss the indictment be denied.

## FINDINGS OF FACT

In January 2013, Detective Scott Betz of the Burleigh County Sheriff's

Department in Bismarck, North Dakota, was investigating a case involving

computer-facilitated exploitation of children.  (Gov't Ex. 2, Aff. of Jared

Drengson ("Drengson Aff.") ¶ 7.)  In that investigation, Detective Betz used an

undercover persona as a 14-year-old female to determine that an individual

named Travis Guenther was attempting to have a sexual encounter with a minor,

an offense for which he was arrested.  (Drengson Aff. ¶¶ 8-10.)  After his arrest,

Guenther was interviewed by law enforcement officers in June 2013 about a

laptop computer that he owned.  (*Id.* ¶ 11.)  On Guenther's laptop, law

enforcement located a folder containing pictures of a prepubescent minor

female's genital area, along with a hand of an adult female.   (*Id.*)  These images

appeared to have been created several years earlier, in May 2010.  (*Id.* ¶ 19.)

During further investigation into those images and others on Guenther's

electronic devices, Guenther told law enforcement that the pictures located on

his laptop had been taken by Merrell of her juvenile daughter and that Guenther had promised to pay Merrell a significant sum of money in exchange for the photographs.  (*Id.* ¶¶ 12-16.)  Based on Guenther's statements about the images on his computer and his relationship with Merrell, law enforcement believed the adult female's hands depicted in the images were Merrell's hands.  (*Id.* ¶ 20.)

In March 2014, Detective Betz contacted Special Agent Jared Drengson of the Department of Homeland Security ("DHS") about Betz's investigation of Guenther and the suspicion that Merrell had produced child pornography.  Based on that information, Special Agent Drengson began an investigation of Merrell's suspected involvement in production of child pornography.  First, Special Agent Drengson issued a DHS summons to the Minnesota Department of Employment and Economic Development ("DEED") to obtain information about Merrell's employment records.  Special Agent Drengson sought these employment records to determine whether Merrrell was employed in a job that put her in regular contact with children.  Then, Special Agent Drengson sought and obtained a search warrant for Merrell's residence in Cottage Grove, Minnesota. The search warrant authorized law enforcement to search Merrell's home for a pillow case that was depicted in one of the images of suspected child pornography, and which Special Agent Drengson believed would be in Merrell's house.  Special Agent Drengson also sought and obtained a search warrant to take "body views and photography" of Merrell's hands.  (Gov't Ex. 2, Mar. 14, 2014 Application for a Search Warrant.)

3

On March 14, 2014, the same day that Special Agent Drengson obtained the warrants for her home and for photographs of her hands, he and several other law enforcement officers went to Merrell's Cottage Grove residence to execute the search warrants. When they arrived at the residence, Merrell was not there, so Special Agent Drengson called Merrell's cell phone. Special Agent Drengson told Merrell that he had a search warrant for her home and that he wanted to speak with her. He asked her if she would return to her home so that they could speak in person.[1] He also asked whether her children were with her and if Merrell would bring them back to the house. Merrell was about thirty minutes away from her home helping a friend move, but Merrell had her friend drive Merrell and her two children back to the Cottage Grove residence.

When Merrell got back to her home, there were several police vehicles parked outside the residence, and eight to ten law-enforcement officers were at the property. Special Agent Drengson, along with Detective Tom Ueland of the Cottage Grove Police Department and Special Agent Ann Quinn of the Minnesota Bureau of Criminal Apprehension, met Merrell outside the front of the residence. When she arrived at the house, no one told Merrell that she was not

---

[1]     Merrell testified at the hearing on her suppression motions. She denied that Special Agent Drengson asked her to come back to the house. Merrell testified that Special Agent Drengson told her she had to come back to the house and that she had to bring her children with her. Merrell stated that she felt she did not have a choice whether to return to her home with her children. Special Agent Drengson denied ever telling Merrell that she had to come home.

under arrest, that she did not have to answer any questions, or that she was free to end the encounter and leave.[2]

Special Agent Drengson, Special Agent Quinn, and Detective Ueland then interviewed Merrell and told her that they were trying to find the origin of child pornography images that Guenther had on his computer.  (Gov't Ex. 3, CD Audio Recording of Interview ("CD") 40:15-:29.)  During that interview, Merrell initially denied knowing where Guenther got any of the photos that he possessed. (CD 40:30-:35; *id.* at 53:20-:45.)  However, Merrell eventually made several incriminating statements, including admitting that she took explicit photographs of her daughter for Guenther in exchange for money and that her hands appear in certain photographs that were on Guenther's computer, and.  (CD 56:00-1:00:35.)  Merrell made these incriminating statements after the officers told her they were there to "help" her and that she ought to talk to them because they wanted to keep Guenther in jail.  (CD 54:00-:35.)

The entire interview lasted approximately forty to forty-five minutes.  (CD 39:10-1:23:26.)  When the interview began, Merrell told the officers that she

---

[2]     Special Agent Drengson testified that when Merrell arrived at the house, he informed her that the interview would be a voluntary one and that she was not under arrest.  However, that interaction is not reflected in the audio recording of the interview that took place outside Merrell's home.  (Gov't Ex. 3, CD Audio Recording of Interview.)  The recording was playing for nearly forty minutes before Merrell arrived at the house, including the moment when Merrell showed up and the officers greeted her on the landing near the front door.  Had Special Agent Drengson told Merrell that she was not under arrest and that the interview would be voluntary, one expects that it would be reflected in the recording.

wanted to talk outside the house so that she could smoke a cigarette.

(CD 39:10-:20.)  At one point during the interview, Special Agent Quinn asked

Merrell if she wanted to go inside a vehicle to talk because Merrell appeared to

be getting cold, but Merrell said she wanted to stay outside, and the officers

agreed.  (CD 50:25-:30.)  The officers eventually told Merrell that they had a

search warrant for her house and that they would need to go inside to conduct a

search for a pillow case depicted in one of the photos.  (CD 1:05:10-:50.)

Throughout the remainder of the interview and during the officers' search of

Merrell's residence, Special Agent Quinn remained with Merrell.  The officers

never raised their voices during the interview.  Nor did the officers ever threaten

Merrell during the interview.  Nor did they make any false promises to Merrell.

The tone of the entire interview was calm and conversational.  Special Agent

Drengson did not observe anything about Merrell's demeanor or behavior that

suggested she was intoxicated or unable to understand the topics they

discussed.

   After the interview and the search of Merrell's home, Detective Ueland

talked to Merrell about going with the officers to the Cottage Grove Police

Station.  Merrell was told that she had to go with the officers to the station.[3]

---

[3]      Merrell and Special Agent Drengson disagreed about what transpired
before she was transported to the Cottage Grove Police Station.  Drengson
stated that he asked Merrell to go to the police station, but Merrell testified that
she was told she had to go to the police station.  Although Special Agent
Drengson testified on direct examination that he asked Merrell to come to the
                    (Footnote Continued on Following Page)

Merrell was informed that the officers wanted to take photographs of her hands at the station and that her children were being taken there.  Special Agent Drengson did not want to take photos of Merrell's hands in her home because the lighting was low, the home was in disarray, and he wanted a more controlled environment to get useful images.  The officers brought Merrell to the Cottage Grove Police Station to take photos of Merrell hands pursuant to a second search warrant.

Special Agent Drengson, Special Agent Quinn, and Detective Ueland then took Merrell and her children to the Cottage Grove Police Station in a law-enforcement van.  Merrell's children sat in the rear of the van, Special Agent Quinn and Merrell occupied the middle bank of seats, and Detective Ueland and Special Agent Drengson were in the front of the vehicle.  When they arrived at the police station, the van entered a secured garage area, and the occupants of the vehicle entered the station through a door inside the garage.  Once everyone was inside and reached an elevator, someone told Merrell that she and her children would be separated, and while her children went elsewhere, Special

_____

(Footnote Continued from Previous Page)
police station, he later admitted on cross-examination that it was Detective Ueland who actually spoke with Merrell about coming to the police station. Detective Ueland did not testify at the hearing.  Given the contradiction in Special Agent Drengson's testimony on this issue, the Court finds that his testimony was not credible when he stated that he asked Merrell to come to the station.  Thus, the Court is left with the evidence that Detective Ueland talked with Merrell about going to the station and Merrell's testimony that she was essentially ordered to go there.

Agent Drengson and Special Agent Quinn led Merrell to an evidence room to execute the search warrant by taking photographs of Merrell's hands.

The evidence room was about twenty feet long by fifteen feet wide and had a steel table in its center.  Once inside, Special Agent Drengson showed Merrell a copy of the search warrant for obtaining images of her hands.  Special Agent Drengson then began photographing Merrell's hands.  He would ask Merrell to put her hands at certain angles, and if she did not get the angle correct, he would adjust the position of her hands to "pose" them in a manner similar to that depicted in child pornography images relevant to the Special Agent Drengson's investigation.  In this way, Special Agent Drengson took approximately forty-seven pictures of Merrell's hands.  While Special Agent Drengson was taking these pictures, he asked Merrell several questions and showed her images of the suspected child pornography.  Merrell made incriminating statements in response to these questions.  This interview was not audio recorded.  This interview and the photographing of Merrell's hands lasted approximately fifteen to twenty minutes.

Merrell was not placed under arrest after Special Agent Drengson had completed taking pictures of her hands.  She was released, and someone from the police station gave her a ride back to her house.  Her children did not leave the station with her because they had been taken into the custody of the county for a child-welfare hold.  On November 3, 2014, Merrell was indicted in this case (Doc. No. 1), and two days later, Merrell was charged by Washington County in a

complaint asserting that she used a minor in a sexual performance or pornographic work in violation of Minnesota State law.  (Doc. No. 13, Attach. 1, Washington County Compl.)  On November 5, 2014, Merrell made her first appearance in this case.  (Doc. No. 4.)

## CONCLUSIONS OF LAW

### I.    Motion to Suppress Statements

Merrell moves to suppress both the statements she made during the interview at her house and the statements she made to Special Agent Drengson at the Cottage Grove Police Station.  (Doc. No. 36, Def.'s Mem. in Supp. of Pretrial Motions ("Def.'s Mem.") 5-12.)  She contends that she was in custody during both interviews and was subjected to direct questioning, but was never provided the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966), prior to that questioning.  (*Id.*)  Merrell argues that because these statements were taken in violation of *Miranda*, the government must not be permitted to use them in its case in chief.  The government opposes the motion, contending that Merrell was not in custody during either interview, and thus law enforcement were not required to give Merrell any *Miranda* warnings prior to questioning.  (Doc. No. 37, Gov't Post-Hr'g Resp. to Def.'s Pretrial Mots. ("Gov't Resp.") 5-11.)

### A.    Legal Standard

To use a defendant's statements made during a custodial interrogation against her at trial during the government's case-in-chief, law enforcement must provide a *Miranda* warning prior to questioning.  The warning must inform a

defendant that she has the right to remain silent, that anything she does say can be used against her as evidence, that she has a right to the presence of an attorney, and that if she cannot afford an attorney one will be appointed for her. *Miranda*, 384 U.S. at 444.

A custodial interrogation that triggers the need for *Miranda* warnings is one that "involves questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. Although not an exhaustive list, in determining whether a defendant was in custody at the time of questioning, this Court considers such factors as:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir.1990); *see also United States v. Czichray*, 378 F.3d 822, 827 (8th Cir.2004) (indicating that the *Griffin* factors serve as a guide in resolving the question "whether the defendant was restrained as though he were under formal arrest"). If a suspect was not in custody at the time of questioning, statements she makes in response to law-

enforcement questioning may be admitted at trial even if no *Miranda* warnings preceded the interrogation.

The parties do not dispute that no law-enforcement officer provided *Miranda* warnings to Merrell, nor that Merrell was interrogated during either the interview at her home or the interview at the police station.[4]  Thus, whether Merrell's statements are admissible in the government's case-in-chief depends on whether **she** was in custody at the time of questioning.

### B.    Statements Made at Defendant's Home

Merrell asserts that she was in custody when Special Agent Drengson, Special Agent Quinn, and Detective Ueland interviewed her at her home on March 14, 2014.  She contends a reasonable person would not have felt free to end the encounter because Special Agent Drengson essentially ordered her, on the phone, to come back to her house and told her she had to bring her children with her.  She also argues that at no point was she told she was free to end the encounter or that she did not have to talk to the officers.  Merrell further asserts that Special Agent Drengson admitted at the hearing that he had an investigative purpose in questioning her.  She argues that the delay in executing the search warrant indicates that the officers were hiding the fact that she was a target of the

---

[4]    To trigger the protections of *Miranda*, an individual must also be subjected to "interrogation."  Interrogation refers to "questioning initiated by law enforcement officers."  *Miranda*, 384 U.S. at 444.  And it is defined as "express questioning or its functional equivalent."  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  The parties do not dispute that Merrell was interrogated during either the interview at her home or the interview at the police station.

investigation.  Further, Merrell contends that she was in custody because there

were several law-enforcement vehicles at her house, and close to ten officers

were present during the execution of the search warrant.  Finally, Merrell

contends that she was in custody because Special Agent Quinn remained with

her the entire time they were inside the house and the search warrant for her

home was being executed.  (*See* Def.'s Mem. 5-11.)

The Court concludes that Merrell was not in custody when she was

interviewed at her home.  At no point during the interview did any of the officers

threaten Merrell, raise their voices, or make any false promises.  Nor did the

officers engage in any strong-arm tactics or physically restrain Merrell in any

way.  Merrell never asked to stop talking to the officers at any point during the

interview.  The entire interrogation lasted only forty to forty-five minutes, which

was not unduly burdensome, and there was nothing that occurred during the

interview to suggest that the questioning would continue indefinitely until Merrell

gave the officers whatever answers they wanted.  *See Berkemer v. McCarty*, 468

U.S. 420, 439 (1984) (suspect in custody where "the detainee is aware that

questioning will continue until he provides his interrogators the answers they

seek").  Further, once that relatively brief period ended and the interview and

search of Merrell home concluded, the officers did not place Merrell under arrest.

*United States v. Galceran*, 301 F.3d 927, 931 (8th Cir. 2002) ("Lack of arrest is a

'very important' factor weighing against custody.") (quoting *United States v.

Sutera*, 933 F.2d 641, 647 (8th Cir. 1991).

In addition, the interview took place at Merrell's home, and "[w]hen a person is questioned on h[er] own turf, [the Eighth Circuit has] observed repeatedly that the surroundings are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation." *Czichray*, 378 F.3d at 826 (citations and quotations omitted).  Although the interview involved three law enforcement officers, one of which accompanied Merrell throughout the search that followed, and a team of approximately ten law enforcement personnel executed the search warrant for the house, there is no requirement that *Miranda* warnings precede any questioning merely because a group of officers execute a search warrant.  *See United States v. Williams*, 760 F.3d 811, 815 (8th Cir. 2014) (explaining that execution of a search warrant is not equivalent to an arrest and noting that because a team of law enforcement officers is inevitably involved in executing any search warrant, courts should avoid placing undue focus on whether the atmosphere is police dominated in such cicumstances).  Contrary to Merrell's contention that the atmosphere in these circumstances was police dominated, the officers allowed Merrell to dictate where the discussion would take place.  Specifically, the officers agreed to talk with Merrell outside the house when she indicated that she wanted to remain outside the home to smoke a cigarette and later refused Special Agent Quinn's suggestion that they could warm up by speaking inside a vehicle.  This interrogation did not involve the type of inherently coercive police conduct that normally accompanies a custodial interrogation.

Another factor that supports the Court's conclusion that Merrell was not in custody during the interview at her house is that she agreed to come home to speak with the Special Agent Drengson. The Court notes that there is a discrepancy between, on the one hand, Merrell's testimony that Special Agent Drengson essentially ordered her to come home when they spoke on the phone, and, on the other hand, Special Agent Drengson's testimony that he asked Merrell to come back to her house and she agreed. The Court concludes that, on this point, Special Agent Drengson's testimony is more credible than Merrell's. On the recording of the interview at Merrell's home, given the conversational tone of the interaction when Merrell arrived at the house, the Court is not convinced that she had been ordered to return home against her will. Accordingly, the Court concludes that, with respect to the interview at Merrell's residence, Merrell voluntarily acquiesced to Special Agent Drengson's request that she respond to questions. *Griffin*, 922 F.2d at 1349 (indicating that a suspect who initiates contact with authorities or voluntarily acquiesces to official requests to respond to questions mitigates the existence of custody).

Finally, the Court notes that none of the law-enforcement personnel at Merrell's house told her when she arrived that the interview was voluntary, that she did not have to answer questions, or that she was not going to be placed under arrest. Special Agent Drengson testified that when Merrell arrived, he told her that the interview would be voluntary and that she was not under arrest, but this testimony is directly contradicted by the audio recording of the interview.

14

The Court concludes, therefore, that no such statement was made to Merrell at her home when she arrived.  Although this fact weighs in favor of a finding of custody, given the location of the interview, the fact that Merrell was able to dictate that the discussion would take place outside her home while she smoked, and the conversational manner in which the officers conducted the interview, the Court concludes that Merrell was not in custody when she made the incriminating statements at her home on March 14, 2014.

For these reasons, based on the totality of the circumstances, the Court recommends that Merrell's motion to suppress the statements she made at her home on March 14, 2014, be denied.

### C.    Statements Made at the Cottage Grove Police Station

Merrell next contends that the statements she made at the Cottage Grove Police Station must be suppressed because she was questioned while in custody but was not provided warnings consistent with *Miranda*.  She contends that she was in custody during this interview because she was taken to the police station against her will, brought into the station through a secured garage, escorted into the building by police, separated from her children, taken to an evidence room while accompanied by Special Agent Quinn, and then had her hands manipulated during the execution of the search warrant, while Special Agent Drengson confronted her with images of child pornography.  (Def.'s Mem. 11-12.)

The Court concludes that Merrell was in custody during questioning at the Cottage Grove Police Station.  Because she was in custody, and because

Special Agent Drengson's questioning was not preceded by *Miranda* warnings, the Court recommends that the government be prohibited from using the statements Merrell made at the police station against her during its case-in-chief. The Court reaches this conclusion based on its finding that Merrell was never informed, prior to questioning at the police station, that she was not under arrest, that she did not have to answer any questions if she did not want to, that her participation in the interview was voluntary, or that she could terminate the interview and leave at any time. Typically, informing a suspect that she does not have to answer questions and that she is not under arrest is the most effective way to indicate to a reasonable person that she is free to terminate questioning and leave. *See Griffin*, 922 F.2d at 1349 (explaining that informing a suspect of these facts is "[t]he most obvious and effective means of demonstrating that a suspect has not been taken into custody"). That did not happen here. As noted above, *see* note 2, *supra*, the only audio recording in this case from the interview at Merrell's home includes no such discussion. The recording had been running for nearly forty minutes by the time Merrell arrived, and one would expect that, had Special Agent Drengson informed Merrell that she did not need to answer the officers' questions and that she was not under arrest, such an exchange would have been captured in the recording. Thus, there is no credible evidence that Merrell was told the interview was voluntary and that she was not under arrest when she arrived at her home.

Nor is there any credible evidence that Merrell was informed that she did not have to answer any questions after the recording from the interview at her house concluded.  Special Agent Drengson initially testified at the hearing that he asked Merrell to come down to the station and she agreed, which would suggest that she knew the interview was voluntary.  However, Drengson admitted on cross examination that Detective Ueland was the official who actually spoke with Merrell about coming to the station.  The government offered no evidence from Detective Ueland about the substance of any conversation he had with Merrell, so there is no evidence that he told Merrell she did not have to answer any questions or that she was not under arrest.  Given the absence of such evidence and the contradiction in Special Agent Drengson's testimony about who spoke with Merrell about coming to the station, the Court concludes that Special Agent Drengson's testimony about the circumstances preceding the transportation of Merrell to the station is not credible.  As a result, there is no credible evidence that any law enforcement official ever affirmatively told Merrell she did not have to answer Special Agent Drengson's questions at the station, that she was not under arrest at that time, or that she was free to terminate questioning and leave. Accordingly, the Court concludes that Merrell was never informed that she was not required to answer questions, that she was not under arrest, or that she could terminate questioning and leave the police station.  *See also*, note 3, *supra*.

Other facts also support the Court's conclusion that Merrell was in custody when she was questioned at the station.  Before going to the station, Merrell was

advised of the officers' desire to photograph her hands and their preference that those photos be taken at the police station rather than at her home.  Although there was conflicting testimony about whether Merrell was asked to come to the station or told that she had to go there, the Court has found that Merrell was told she had to go to the police station for her hands to be photographed.  These facts support a finding of custody.  A reasonable person who is informed that officers have a warrant to take photographs of her person, that they want to take those photos at a police station, and that she has to go with them to the police station so that the warrant can be executed would not feel free to tell the officers that she will remain at home.

Once at the station, during the time Merrell was complying with Special Agent Drengson's execution of the warrant for photographing her hands, Merrell's freedom of movement was restrained.  Not only did Special Agent Drengson instruct Merrell on where to place her hands, but he restricted her personal autonomy by physically altering the position of her hands to pose them in the positions he desired.  Moreover, Special Agent Drengson did not testify that if Merrell had asked to terminate questioning and leave, he would have allowed her to do so.  The facts before the Court suggest that he would not have allowed her to leave until he completed taking photographs of her hands pursuant to the warrant.  Based on these facts, the Court concludes that a reasonable person in Merrell's shoes would not have felt free to terminate the questioning and leave the police station.  A reasonable person under these

circumstances would have believed her freedom of action was curtailed to a degree associated with formal arrest.

Further, the fact that Special Agent Drengson's questioning during the second interview occurred inside the police station supports a finding of custody because the station house is inherently more coercive than the area around and inside Merrell's home, where Merrell had made non-custodial statements earlier in the day. The government argues that an individual is not in custody for purposes of *Miranda* simply because she is questioned at a station house. (Gov't's Resp. at 10-11.) Although correct, that point proves little because the Court has not determined that Merrell was in custody during the police-station interview based solely on the fact that she was at the Cottage Grove Police Station. Rather, the Court also bases its conclusion on the fact that Merrell was not informed she was not under arrest or that she did not have to talk to officers, as well as the fact that Merrell was informed the officers wanted to execute the warrant for photographs at the police station. In addition, the Court concludes that Merrell's freedom to depart was restricted by Special Agent Drengson's instructions to Merrell on how to hold her hands during the execution of the warrant and his manipulation of her hands into poses that he wanted the images to reflect. And the Court concludes that Merrell could not have simply left the police station and unilaterally terminated Special Agent Drengson's execution of the warrant. A reasonable person under these circumstances would feel that her

freedom was restrained in a manner akin to formal arrest and would not feel free to terminate questioning and leave.

The government also contends that Merrell was not in custody because she was not arrested at the end of the interview.  (Gov't's Resp. 10.)  The fact that a suspect is not arrested can be a factor weighing against a finding that the person was in custody during an interrogation.  But under these circumstances, the restrictions a reasonable person would feel on her freedom of movement at the time of questioning are not made less significant by the officers' subsequent decision not to arrest her.  She had not been told before she was questioned that she was not under arrest or that she would not be placed under arrest.  And again, pursuant to the search warrant he was executing, Special Agent Drengson ordered Merrell to pose her hands in specific positions and placing her hands into the desired position when he felt it necessary to do so. This is not the same as handcuffing a suspect or shackling a suspect to a chair until she confesses, but neither is it unfettered freedom to end the encounter and leave.  This physical restraint on Merrell's movement, combined with the other factors supporting a finding of custody, warrants the conclusion that a reasonable person would not have felt free to end the interrogation and leave the police station.

Relying on *United States v. Lebrun*, 363 F.3d 715 (8th Cir. 2004), the government argues that the Eighth Circuit has rejected a finding of custody in cases involving jailhouse interviews more indicative of custody than the one involved in this case.  (Gov't's Resp. 10.)  But there were "important" factors

present in *LeBrun* "militat[ing] against a finding of custody" that are not present

here. *Id.* at 723. For example, LeBrun's "work experience; education,

specifically his legal training; and his past experience with NCIS agents

weigh[ed] against custody." *Id.* at 723. There is no evidence that Merrell had the

type of past experiences with investigators that LeBrun had; nor is there any

evidence that Merrell is the same type of "educated, sophisticated individual" as

LeBrun, which renders a comparison of a reasonable person in LeBrun's position

and a reasonable person in Merrell's of little value. *See id.* at 723 (noting that

". . . the relevant inquiry is not whether any random reasonable person would

have determined that he was in custody, but whether a reasonable person in the

*defendant's position* would have considered his freedom of action restricted to

the degree associated with a formal arrest") (emphasis in original). LeBrun was

also explicitly informed that he was not under arrest and that he was free to leave

at any time three separate times during the interview. *Id.* Special Agent

Drengson never said as much to Merrell, and there is no evidence that any other

law-enforcement official communicated such information to Merrell here. Nor is

there any evidence that Merrell had "a line of communication between [herself]

and the outside world" as LeBrun did, in light of his possession of a cellular

phone during the interview. *Id.* at 722. And LeBrun testified at the suppression

hearing that he understood that he was free to terminate the interview and leave

at any time. *Id.* Merrell did not provide any such testimony here. In other words,

*LeBrun* has little bearing on the determination of custody in this case and does not support the government's position.

The government also contends that "[a] reasonable person faced with these circumstances would have felt free to terminate questioning." (Gov't's Resp. at 10.) But the relevant inquiry for purposes of determining if a suspect is in custody is whether a reasonable person under the circumstances would feel free "'to terminate the interrogation and leave,'" and "'whether the defendant's freedom to depart was restricted in any way.'" *LeBrun*, 363 F.3d at 720 (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995), and *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). Even if Merrell could have told Special Agent Drengson that she did not want to answer any questions and quietly complied with his instructions while he finished photographing her hands pursuant to the warrant, a reasonable person under the circumstances would not have felt that there was no restriction on her freedom to depart. The test for determining whether *Miranda* warnings are required, after all, is not limited to whether a reasonable person could have possibly terminated questioning. Rather, it is whether a reasonable person in the defendant's position would feel free to terminate the interrogation and then leave. As explained above, the Court concludes that Merrell could not have told Special Agent Drengson that he had to stop taking photos and left the police station.

Not every detention of a suspect during the execution of a search warrant amounts to custody for purposes of a *Miranda* analysis. Temporary detention

while law enforcement officers conduct a valid search constitutes custody only if "a reasonable person in [defendant's] position would [not feel] at liberty to end the interrogation and leave." *United States v. Aragon-Ruiz*, 551 F. Supp. 2d 904, 911 (D. Minn. 2008) (citing *United States v. Brave Heart*, 397 F.3d 1035, 1038-39 (8th Cir. 2005)).  Here, a reasonable person in Merrell's position would not feel at liberty to end the interrogation and leave.  Merrell was at the police station so that Special Agent Drengson could execute a warrant that allowed him to take photographs of Merrell's hands.  She had been informed that law enforcement officials were going to execute the warrant and that they wanted to do so at the police station.  She was never told that she could terminate questioning, that she was free to go, or that she was not under arrest.  And when she was at the police station and subjected to questioning, she was required to put her hands in certain poses and the agent questioning her posed her hands for her when she was unable to comply with his instructions.

For these reasons, the Court recommends that Merrell's motion to suppress the statements she made at the Cottage Grove Police Station on March 14, 2014, be granted.

### III.   Motion to Suppress Photographs

Merrell argues that the photographs Special Agent Drengson took of her hands while he was executing a search warrant must be suppressed because he executed that search warrant in an unreasonable manner.  (Def.'s Mem. 13-16.)  She contends that Special Agent Drengson exceeded the scope of the warrant

23

by referring to photographs he had earlier obtained from another investigator (Detective Betz in North Dakota), and posing Merrell's hands to mimic the positions of the hands depicted in those images.  (*Id.* at 15.)  She also contends that he exceeded the scope of the warrant by taking an unreasonable number of photographs and by spending too much time executing the warrant.  (*Id.* at 16.)  The Government contends that Special Agent Drengson reasonably executed the search warrant and that there was nothing improper about his posing of Merrell's hands because he was not required to use the least intrusive means in his execution of the warrant's command.  (Gov't Resp. 11-13.)

### A.    Legal Standard

The Fourth Amendment to the United States Constitution requires that valid warrants be executed in a reasonable manner.  *Hummel-Jones v. Strope*, 25 F.3d 647, 653 (8th Cir. 1994).  "The manner in which a warrant is executed is always subject to judicial review to ensure that it does not traverse the general Fourth Amendment proscription against unreasonableness."  *Id.* at 650.

The test for whether the execution of a search warrant was reasonable is an objective one that ignores the subjective intent of the officers.  *Lykken v. Brady*, 622 F.3d 925, 930 (8th Cir. 2010) (analyzing claim under 42 U.S.C. § 1983 that officers violated the Fourth Amendment by executing a search warrant over four days on the plaintiffs' farm).  That "test of reasonableness . . . is not capable of precise definition or mechanical application," and "[i]n each case it requires a balancing of the need for the particular search against the invasion of

personal rights the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

"Courts must consider the scope of the particular intrusion, the manner in which it

is conducted, the justification for initiating it, and the place in which it is

conducted." *Id.*

### B.    Execution of the Photographic Warrant

This Court concludes that Special Agent Drengson did not unreasonably

execute the search warrant allowing him to obtain "body views and photography

of [Merrell's] hands" (Gov't's Ex. 2) when he took approximately forty-seven

photographs and posed Merrell's hands in certain ways.  Although Special Agent

Drengson manipulated Merrell's hands during the execution of the search

warrant to mimic the positions of the hands depicted in images of child

pornography Merrell was suspected of producing, the Court concludes that, for

purposes of the Fourth Amendment, the need for obtaining useful photographs

pursuant to the search warrant outweighs this intrusion on Merrell's personal

rights.

Moreover, Special Agent Drengson did not exceed the scope of the

warrant by photographing any area of Merrell's body that he was not permitted to

photograph pursuant to the warrant.  *Cf. United States v. Nelson*, 36 F.3d 758,

759-60 (8th Cir. 1994) (concluding that officers who conducted a body cavity

search of the defendant exceeded the scope of a search warrant and executed it

in an unreasonable manner when the warrant authorized only a search of the

defendant's person).  Nor did Special Agent Drengson do anything specifically

forbidden by the search warrant by posing Merrell's hands in positions that were helpful to his investigation.

Finally, Special Agent Drengson did not exceed the boundaries of objective reasonableness in taking approximately forty-seven photographs of Merrell's hands.  Merrell has not explained how the number of photographs taken was overly burdensome.  The warrant did not set a limit on the number of photographs Special Agent Drengson was authorized to take, and the Court is not aware of any bright-line rule that a warrant authorizing body views and photography of a suspect's hands must be limited to a specific number of images.  There is no evidence before the Court that Special Agent Drengson took more photographs than he needed for purposes of his investigation or that he unreasonably prolonged his execution of the search warrant.  Under these circumstances, this Court will not impose an arbitrary limit.

For these reasons, the Court recommends that Merrell's motion to suppress the photographs taken pursuant to the March 14, 2014 search warrant (Gov't's Ex. 2) be denied.

## IV.    Motion to Suppress Administrative Summons

Merrell contends that Special Agent Drengson obtained her employment records from the Minnesota Department of Economic and Employment Development ("DEED") without proper legal authority.  (Def.'s Mem. 16-19.)  She argues that the federal statute Special Agent Drengson referenced in his summons to DEED, 19 U.S.C. § 1509, did not authorize him to obtain the records

he sought.  (*Id.*)  And she contends that, contrary to the government's position,

she has standing under the Fourth Amendment to challenge the seizure of these

materials.  (*Id.* at 19.)  The government contends that Merrell lacks standing to

challenge Special Agent Drengson's use of the summons and that he had

sufficient statutory authority under 19 U.S.C. § 1509 to issue the subpoena.

(Gov't Resp. 13-15.)

For purposes of the Fourth Amendment, this Court concludes that Merrell

lacks a constitutionally cognizable privacy interest in the records at issue.  When

a defendant challenges the use of an administrative subpoena under the Fourth

Amendment, she must show that she has a "constitutionally cognizable privacy

interest" by demonstrating that "(1) [s]he has a reasonable expectation of privacy

in the areas searched or the items seized, and (2) society is prepared to accept

the expectation of privacy as objectively reasonable."  *United States v.*

*Wheelock*, 772 F.3d 825, 828 (8th Cir. 2014) (internal quotations omitted).  As

the Eighth Circuit has explained "the Fourth Amendment does not prohibit the

obtaining of information revealed to a third party and conveyed by him to

Government authorities, even if the information is revealed on the assumption

that it will be used only for a limited purpose and the confidence placed in the

third party will not be betrayed."  *Id.* (internal quotations omitted).  A defendant

has the burden of showing that she has a reasonable expectation of privacy.

*Rakas v. Illinois*, 439 U.S. 128, 130-31 n.1 (1978).

Merrell's employers provided certain employment information to DEED. These documents were not Merrell's private papers, but were records identifying her employment history that had been disclosed to third parties. Consequently, Merrell lacks a reasonable expectation of privacy under the Fourth Amendment to challenge the validity of the administrative subpoena.

Further, the Court agrees with the government's position that there was nothing improper about the fact that Special Agent Drengson issued the administrative subpoena to DEED under 19 U.S.C. § 1509. (Gov't's Resp. 14-15.) That statute gives the United States Customs Service authority to examine records in "any investigation or inquiry conducted for the purpose of ascertaining the correctness of any entry, for determining the liability of any person for duty and taxes due or duties and taxes which may be due the United States, for determining liability for fines and penalties, or for insuring compliance with the laws of the United States administered by the United States Customs Service . . . ." 19 U.S.C. § 1509(a). As an agent within the Department of Homeland Security, which is part of the United States Immigration and Customs Enforcement, Special Agent Drengson is tasked with investigating violations of 18 U.S.C. § 2251, with which Merrell is charged in this case. The Court concludes that there was nothing improper about Special Agent Drengson's issuance of the administrative subpoena to DEED.

For these reasons, the Court recommends that Merrell's motion to suppress the records obtained from DEED pursuant to an administrative summons be denied.

## V.   Motion to Dismiss the Indictment

Merrell seeks to dismiss the indictment in this case based on the government's alleged undue delay in initiating this prosecution. (Doc. No. 27.) Merrell contends that the delay at issue in this case is seven months (March through November 2014), that there is no reason the government should have waited until November 2014 to charge this crime, and that she and her family members have been prejudiced by the delay. (Def.'s Mem. 20-23.) She argues that the delay in this case violates her rights to due process and fundamental fairness under the Fifth Amendment. (*Id.* at 20, 21 n.9.)

Statutes of limitations generally protect a defendant from being charged with acts that have become stale,[5] but "the due process clause does have a limited role to play in protecting against oppressive delay." *United States v. Brockman*, 183 F.3d 891, 895 (8th Cir. 1999) (quotations omitted). "To establish pre-indictment delay, a defendant must show that the delay resulted in actual and substantial prejudice to h[er] defense, and that the government intentionally delayed the indictment to gain a tactical advantage or to harass h[er]." *United States v. Sprouts*, 282 F.3d 1037, 1041 (8th Cir. 2002). "Substantial prejudice

---

[5]   Merrell makes no statute-of-limitations argument in support of her motion to dismiss the indictment.

cannot be established with the mere possibility of prejudice inherent in any extended delay: that memories will dim, witnesses will become inaccessible, and evidence will be lost." *United States v. Johnson*, 28 F.3d 1487, 1493 (8th Cir. 1994) (quotations omitted). "To establish actual prejudice, a defendant must identify witnesses or documents lost during the delay period." *United States v. Gladney*, 474 F.3d 1027, 1031 (8th Cir. 2007).

The thrust of Merrell's motion to dismiss the indictment is that the length of time between Special Agent Drengson's initiation of the investigation in this matter and the indictment has burdened her relationship with her children. (Def.'s Mem. 21-23.)  She makes no showing that the government has intentionally delayed her prosecution to harass her or gain any tactical advantage over her.  Nor does she argue, let alone prove, that the seven-month delay at issue has caused any identified witnesses' memories to dim, that any identified witnesses will become inaccessible, or that evidence has been lost.  Accordingly, the Court concludes that Merrell has failed to demonstrate any violation of her Due Process rights.

For these reasons, the Court recommends that Merrell's motion to dismiss the indictment for unreasonable delay be denied.

## RECOMMENDATION

For all the foregoing reasons, **IT IS HEREBY RECOMMENDED** that:

1.     Defendant's Motion to Suppress Statements (Doc. No. 22), be **GRANTED IN PART** and **DENIED IN PART** as follows:

a.      The motion should be **GRANTED** with respect to Defendant's request that statements she made to Special Agent Drengson at the Cottage Grove Police Station while he was executing a search warrant on March 14, 2014, for photography of her hands be suppressed;

b.      The motion should be **DENIED** with respect to Defendant's request that statements she made to law enforcement officials at her home on March 14, 2014, be suppressed;

2.      Defendant's Motion to Suppress Evidence Obtained as a Result of Illegal Seizure and Searches (Doc. No. 23), be **DENIED**.  This recommendation applies to Defendant's request for suppression of the photographs taken of Defendant's hands at the Cottage Grove Police Station on March 14, 2014, and her request to suppress the evidence obtained as a result of an administrative summons issued to the Minnesota Department of Employment and Economic Development;

3.      Defendant's Motion for Dismissal Based on Undue Delay (Doc. No. 27), be **DENIED**.

Date: January 23, 2015

 *s/ Jeffrey J. Keyes*
JEFFREY J. KEYES
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 6, 2014**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's

right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within **fourteen days** after service thereof.  All briefs filed under this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within **ten days** of receipt of the Report.